IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MATTHEW C. STECHAUNER,

                        Plaintiff,

         v.                                                OPINION and ORDER

PATRICK MURPHY, PHILLIP WHEATLEY,                          17-cv-221-jdp
TROY SHEIDE, GARY NEAU, and
DORRIE HANSEN,[1]

                        Defendants.

Pro se plaintiff Matthew Stechauner is an inmate at Oshkosh Correctional Institution (OCI). He alleges that defendant Gary Neau, a correctional sergeant, ignored his threats of self-harm and allowed him to attempt suicide, and that defendants Patrick Murphy, Philip Wheatley, Troy Sheide, and Dorrie Hansen, all medical personnel at the prison, failed to treat his various physical and mental health issues. He brings claims under 42 U.S.C. § 1983 for violation of his rights under the Eighth Amendment.

Both sides move for summary judgment. Dkt. 69 and Dkt. 79. I will deny Stechauner's motion and grant defendants' motion in part. There is a genuine dispute regarding whether Stechauner told Neau that he was suicidal and whether Neau ignored that statement. This dispute will need to be resolved by a jury. But as for Stechauner's claims against the medical staff at OCI, the undisputed facts show that defendants Murphy, Wheatley, Sheide, and Hansen attended to, and provided extensive treatment for, Stechauner's various physical and mental health problems. Although Stechauner disagrees with some of their treatment decisions,

---

[1] I have updated the caption to reflect the correct spelling of defendants' names.

no reasonable jury could conclude that these defendants were deliberately indifferent. So I will grant summary judgment for defendants on Stechauner's claims against medical personnel.

Also before me is Stechauner's motion for leave to file a reply in support of additional proposed findings of fact, Dkt. 97, and renewed motion for assistance in recruiting counsel, Dkt. 99. I will deny both motions. The additional proposed findings of fact are outside the scope of this lawsuit, so I have not considered them. And I will deny Stechauner's request for assistance in recruiting counsel because I am not persuaded that Stechauner will be unable to try the case himself.

ANALYSIS

**A. Motions for summary judgment**

**1. Scope of claims**

In my screening order, Dkt. 31, I granted Stechauner leave to proceed on the following claims under the Eighth Amendment:

- a deliberate indifference claim against Neau for ignoring Stechauner's suicide threats at 11:30 a.m. on September 10, 2016;

- three deliberate indifference claims against Murphy for failing to treat Stechauner from November 2015 to March 2016, during May 2016, and during September 2016;

- a deliberate indifference claim against Sheide for refusing to refer Stechauner to a psychiatrist;

- a deliberate indifference claim against Hansen for delaying medical care after screening a health-service request that Stechauner filed on October 24, 2016; and

- two deliberate indifference claims against Wheatley for failing to treat Stechauner in November and December 2016, and for failing to treat Stechauner's paralyzed vocal cord in spring 2017.

I will consider only the above-listed claims. In Stechauner's combined brief in reply in support of summary judgment and in opposition to defendants' motion for summary judgment, Dkt. 89, Stechauner raises for the first time a new claim against Wheatley for denying a surgery to treat acid reflux in July 2018. It is too late for him to add this claim to the case. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). I have not considered this claim, nor any other potential claims that are outside the scope of Stechauner's amended complaint and my screening order. Because Stechauner's additional proposed findings of fact, Dkt. 92, relate only to this new claim, I have not considered any of the materials submitted as exhibits to Stechauner's additional proposed findings of fact, nor have I considered his reply in support of his additional proposed findings of fact. Dkt. 98.

I will address Stechauner's claim against Neau first, followed by his claims against the medical defendants.

## 2. Claim against Neau for deliberate indifference to threats of suicide

Stechauner contends that defendant Gary Neau, a sergeant at OCI, was deliberately indifferent to his threats of suicide on September 10, 2016. Correctional officers are required to take reasonable measures to ensure the safety of suicidal inmates, and failure to do so can constitute deliberate indifference in violation of the Eighth Amendment. *See, e.g., Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). "Deliberate indifference to a risk of suicide is present when an official is subjectively 'aware of the significant likelihood that an inmate may imminently seek to take his own life' yet 'fail[s] to take reasonable steps to prevent the inmate from performing the act.'" *Pittman ex rel. Hamilton v. County of Madison, Illinois*, 746 F.3d 766,

775-76 (7th Cir. 2014) (alteration in original) (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)).

In this case, the parties give conflicting accounts about what happened on September 10. *See* Dkt. 22, ¶ 22 and Dkt. 96, ¶¶ 21–26. Stechauner says that he had a conversation with Neau at 11:30 a.m. and told him that he was suffering from a cough, chest pains, and anxiety attacks, and that these medical problems made him feel suicidal. He says that Neau ignored these comments and walked away, but came back to his cell at 12:30 p.m. to check on him. By that point, Stechauner had already tied a bedsheet around his neck. He then swallowed three screws in front of Neau.[2]

Neau, on the other hand, says that he cannot remember having a conversation with Stechauner on the morning of September 10. But he says if an inmate told him that he was suicidal, he would have called for help immediately. According to Neau, it was other staff members who notified him at 12:30 that Stechauner had screws in his cell and a bedsheet tied around his neck. He says that he immediately contacted his supervisor after getting the news.

This dispute cannot be resolved at summary judgment. If a jury were to believe Stechauner's version of events, it could conclude that Neau was deliberately indifferent. The court of appeals has repeatedly held that statements from a prisoner that he is going to kill or seriously harm himself are sufficient to put prison staff on notice of a strong likelihood that that prisoner will engage in self harm. *Miller v. Harbaugh*, 698 F.3d 956, 962–63 (7th Cir. 2012). If Stechauner told Neau that he felt suicidal, "that alone should have been enough to

---

[2] Stechauner does not explain where the screws came from, and he does not allege that Neau continued to ignore him after he swallowed the screws. There is a dispute regarding whether Stechauner actually swallowed the screws, but defendants concede that this dispute cannot be resolved at summary judgment. Dkt. 96, ¶ 27.

impute awareness of a substantial risk of suicide." *Sanville*, 266 F.3d at 737–38 (internal quotations omitted).

Defendants nonetheless argue that no jury could find that Neau ignored Stechauner's statements, because Stechauner says that Neau returned to his cell one hour later. But that still means that Neau *did* ignore the risk that Stechauner would attempt suicide during that hour. And it was during that hour that Stechauner allegedly tied a sheet around his neck. It's true that Stechauner says he did not finish his suicide attempt until after Neau returned to his cell, but as defendants concede, even a risk of harm can constitute an actionable harm under the Eighth Amendment. Dkt. 80, at 23–24. The fact that Stechauner did not attempt suicide as soon as Neau walked away is not a reason to grant summary judgment.

Alternatively, defendants contend that they are entitled to summary judgment on the basis of qualified immunity. But defendants develop no real argument in favor of applying the doctrine to Stechauner's claim against Neau. And the rule that prison officials must take threats of suicide seriously has long been clearly established. *E.g. Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk."). If Neau was aware that Stechauner was suicidal, as Stechauner alleges, then his actions would fall within this clearly established law. So I will not grant summary judgment on qualified immunity grounds either.

At the same time, I will also deny Stechauner's motion for summary judgment. If a jury were to believe Neau's version of events, rather than Stechauner's, then Neau was not aware of the risk of self-harm and therefore cannot be held liable. It all comes down to which party is

more credible, and credibility determinations are a job for the jury. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### 3. Claims against medical staff for denial of treatment

The rest of Stechauner's claims are against medical staff at OCI for denial of medical treatment. To succeed on these claims, Stechauner must prove two elements: (1) he had a serious medical need; and (2) defendants were deliberately indifferent to that medical need. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

Stechauner seems to believe that defendants are entitled to summary judgment only if they can show that he lacks evidence for *both* elements of his claims. Dkt. 89, at 36. But Stechauner has it backwards. As the plaintiff, he has the burden of proof. If he fails to provide evidence in support of either one of the required elements, then I may enter summary judgment against him. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). Because Stechauner cannot meet his burden to prove that each defendant was deliberately indifferent, defendants are entitled to summary judgment regardless of whether Stechauner actually had a serious medical need.

A defendant is deliberately indifferent to a medical need if he or she knows of the need and disregards it. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). When, as here, the plaintiff challenges decisions made by medical professionals, then the plaintiff must show more than a mere disagreement with a defendant's treatment decisions. "There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). A treatment decision constitutes deliberate indifference only if it is "blatantly inappropriate," *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014), or "'such a substantial departure from accepted professional

judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on [medical] judgment.'" *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). Inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

With these standards in mind, I will consider Stechauner's claims against each medical defendant.

### a. Claims against Murphy

Defendant Patrick Murphy was Stechauner's primary care provider from November 2015 to November 2016. I allowed Stechauner to proceed on three claims against Murphy: (1) Murphy ignored Stechauner's complaints of congestion, coughing, and chest pain from November 2015 to March 2016; (2) Murphy failed to examine Stechauner on May 10, 11, and 12, 2016, even after other medical staff warned him about Stechauner's medical condition; and (3) Murphy ignored multiple health-service requests from Stechauner in September 2016.

**Claim 1: Denial of treatment from November 2015 to March 2016.** This claim fails because the undisputed facts show that Murphy gave Stechauner extensive medical treatment throughout this time period. When Stechauner arrived at OCI in November 2015, Murphy examined him and diagnosed him with an upper respiratory infection. Murphy told Stechauner to drink fluids, continued his existing prescription for an albuterol inhaler, increased the dosage of his existing prescription for guaifenesin (generic Mucinex), and added a prescription for Tylenol. At a follow-up appointment on December 17, Stechauner said that although he sometimes still needed his inhaler in the mornings, his symptoms had improved

enough that he was now able to play basketball. (Stechauner disputes whether his symptoms actually improved, but he does not dispute that he told Murphy that they improved. Dkt. 96, ¶ 7.)

Three months later, in March 2016, Stechauner begin complaining again about his cough, and Murphy again diagnosed him with an upper respiratory infection. Murphy then met with Stechauner regularly throughout the month of March. He prescribed antibiotics, extended Stechauner's prescription for guaifenesin, and switched Stechauner to a new nasal spray. Murphy also placed Stechauner on "no work" status so that he would not be exposed to fumes while working at his kitchen job.

Stechauner contends that Murphy failed to treat his respiratory infections because he prescribed generic and over-the-counter medications rather than more effective prescription medications. But even if Stechauner is correct that more effective medications were available, a prison doctor does not violate the Eighth Amendment simply because the evidence suggests that he "could do better." *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013). There is no evidence to suggest that Murphy's choice of medication was blatantly inappropriate. Stechauner may disagree with Murphy's treatment decisions, but a prisoner's disagreement with treatment is not sufficient to show an Eighth Amendment violation. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Stechauner argues that he told Murphy that these medications did not help his cough or chest pains, but that Murphy continued to use them anyway. If a healthcare provider persists in providing treatment that he knows is ineffective, then that may be evidence of deliberate indifference. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). But that is not what happened here. It is undisputed that Stechauner told Murphy in December that his symptoms

were improving. And when Stechauner reported that his symptoms returned in March, Murphy made changes to his medication and placed him on no-work status. No reasonable jury could conclude that Murphy was ignoring Stechauner's complaints.

**Claim 2: Failing to examine Stechauner in May 2016.** Stechauner's second claim is that Murphy ignored warnings from other medical staff in May 2016. Again, the basic facts are undisputed. On May 10, Stechauner complained to a nurse that he had urgent chest pain, had "coughed up a small amount of blood," and was suffering from stress. Dkt. 82-1, at 118–19. The nurse examined Stechauner for symptoms related to chest pain and noted that Stechauner did not appear to be in acute distress or have shortness of breath. Nonetheless, the nurse contacted the on-call doctor, Dr. Syed, who ordered a follow-up appointment with Murphy the next morning. But when Murphy reviewed Stechauner's chart the next day, he decided that a follow-up appointment was unnecessary.

On May 11, Stechauner told a nurse that he had fallen out of bed and thrown up. The nurse concluded that he was suffering from dehydration and told him to stay hydrated. The nurse did not notify Murphy. Later that night, Stechauner contacted nursing staff again because "some people had confronted him." Dkt. 96, 18. This time, the nurse contacted security staff to address Stechauner's safety concerns and flagged Stechauner's chart for Murphy to review.

On May 13, Stechauner again complained about chest pain, dizziness, and coughing up blood. The parties dispute exactly how Murphy responded, *id.*, ¶ 19, but they agree that he did not ignore the complaint. Adopting Stechauner's version of events (as I am required to do in considering defendants' motion for summary judgment), Murphy examined Stechauner, but

only "checked Stechauner's vitals and sent Stechauner on Stechauner's way." Dkt. 73, ¶ 3. Afterwards, Stechauner did not ask to see a doctor again for the rest of the month.

Stechauner contends that Murphy violated the Eighth Amendment because he did not see him before May 13. But the strongest evidence he can point to in support of his claim is Murphy's disagreement with Syed's order on May 10 for a next-day, follow-up appointment. This is insufficient. Medical professionals are allowed to disagree about the course of treatment. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("medical providers' differing opinions as to best treatment for prisoner do not amount to deliberate indifference") (citing *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)). And here, it's undisputed that Murphy was more familiar with Stechauner's chart and medical history than Syed was. Furthermore, although Syed believed that Stechauner should see a doctor the next day (an assessment that Murphy disagreed with), Syed did not examine Stechauner himself, nor did he think that Stechauner's condition was so serious that it required immediate treatment from a doctor. Perhaps Stechauner is correct that Murphy *should* have seen him sooner, but that shows only that Murphy was negligent. It does not show that Murphy's decision to cancel the appointment was so inappropriate as to violate the constitution.

As for the nurse's "warning" on May 11, the evidence shows only that a nurse flagged Stechauner's chart for review. Dkt. 82-1, at 116. The nurse did not schedule an appointment or tell Murphy that he should examine Stechauner, nor did she say that Stechauner had a medical emergency. Given the nature of the nurse's report (that Stechauner had security concerns that had been forwarded to security staff), it's not clear what Murphy was supposed to do. The only reasonable inference is that the nurse flagged the report to keep Murphy aware of the situation, not to recommend follow-up treatment.

Finally, no reasonable jury could conclude that Murphy's conduct on May 13 violated the constitution. Stechauner contends that Murphy should have provided some treatment other than the "over the counter generic medications" that he had already prescribed. Dkt. 70, at 3. But as explained above, Stechauner has not shown that Murphy's decision to use over-the-counter medication was blatantly inappropriate. It is not enough to argue that a hypothetical, better treatment existed. *Ray*, 706 F.3d at 866.

**Claim 3: Ignoring health-service requests in September 2016.** Stechauner's third claim is that he filed multiple health-service requests in September 2016, but Murphy ignored him until October 5. This claim also fails because although Murphy did not see Stechauner in person, the undisputed facts show that he continued to monitor Stechauner's chart and order treatment throughout the month of September. Stechauner has not pointed to any evidence suggesting that a face-to-face appointment was necessary.

From the outset, it's worth noting that most of the health-service requests that Stechauner filed in September 2016 were never brought to Murphy's attention. For example, nurses treated Stechauner five times from September 21 to September 25 for different physical and psychological issues. Dkt. 82-1, at 100–02. Although some of these examinations resulted in a referral to a psychologist, none of them were flagged for Murphy's review. Because Murphy cannot be held liable for health-service requests that he never saw, my analysis focuses on the instances when Murphy was actually notified of Stechauner's condition.

Murphy was notified four times in September about Stechauner's medical needs. First, he was notified when Stechauner claimed to swallow three screws on September 10 (as described in Stechauner's claim against Neau). Murphy ordered Stechauner sent to the emergency room. There is no dispute that this decision was appropriate.

Second, Stechauner complained to a nurse on September 11 (the day after the screw incident) that he had chest pain and was "coughing up blood." Dkt. 82-1, at 104. He claimed that he had vomited one screw and defecated another, but that one screw was still unaccounted for and was causing the symptoms. The nurse flagged Stechauner's chart for Murphy to review the next day. The next morning, Murphy received a phone call from a staff member in the psychological services unit, who told him that Stechauner had confessed to lying about the screws. *Id.* Murphy then reviewed the emergency room report, which indicated that no foreign bodies had shown up in the x-rays and that the emergency room doctors had diagnosed Stechauner as possibly malingering.[3] Murphy concluded that Stechauner probably did not swallow any screws, and that further evaluation was unnecessary.

Based on the information presented to Murphy, this decision cannot be considered blatantly inappropriate. Stechauner contends that he never confessed to lying and that staff members falsely accused him, Dkt. 96, ¶ 35, but he does not dispute that staff told Murphy that he was lying. There is a genuine dispute regarding whether Stechauner swallowed the screws, Dkt. 96, ¶ 27, and Stechauner may be able to show that Murphy based his decision on bad information, but he cannot show that Murphy was deliberately indifferent.

Third, on September 19, Stechauner told a nurse that he regularly suffered from chest pain in the mornings. Dkt. 82-1, at 102. The nurse noted that this was an issue that Stechauner had been seen for on multiple occasions, but she flagged Stechauner's file for Murphy to review and scheduled an appointment with Murphy on October 4. Stechauner may have preferred for Murphy to see him immediately, but Murphy's decision to wait for the scheduled appointment

---

[3] Stechauner says that the x-ray results showed several objects in his digestive system, Dkt. 96, ¶ 34, but the medical records that he cites are from an unrelated incident. Dkt. 82-1, at 324.

is not evidence of deliberate indifference. Stechauner was complaining of chronic issues, and Murphy knew that Stechauner was already receiving treatment for those issues.

Fourth, on September 27, Stechauner fell down in his cell and hit his head. The on-call doctor implemented a "neurological protocol" to monitor Stechauner for brain injuries and ordered nursing staff to send Stechauner to the hospital if he had any changes in condition. When Stechauner vomited later that night, the nurse monitoring him flagged it as a change in condition and sent him to the emergency room.

At the emergency room, Stechauner received a CT scan, x-rays, and blood tests. *Id.* at 286–302. At the end of the examination, the emergency room doctor diagnosed Stechauner with gastritis. He prescribed Prilosec and ranitidine, recommended a bland diet, and ordered a follow-up appointment with his primary care provider in one week. *Id.* at 301. Stechauner returned to the prison, and nursing staff flagged his chart for Murphy to review.

Murphy did not examine Stechauner in person immediately after the emergency room visit. But he still provided extensive follow-up treatment. Murphy reviewed Stechauner's file and approved the hospital's prescriptions and bland diet. *Id.* at 209. He also had nurses continually monitor Stechauner for neurological symptoms and chest pain and report back to him. *Id.* at 95–96. Finally, Murphy planned to meet Stechauner in one week, as already scheduled. In short, he did everything that the hospital recommended.

As with Stechauner's other claims against Murphy, there is no evidence that Murphy's actions in September 2016 constituted deliberate indifference. For this reason, I will grant summary judgment for defendants on all of Stechauner's claims against Murphy.

### b. Claim against Sheide

Defendant Troy Sheide is a psychologist at OCI who provided mental health services to Stechauner while he was in the restricted housing unit from September 13 to October 5, 2016. Stechauner contends that Sheide was deliberately indifferent because he refused to refer him to a psychiatrist. Because the undisputed facts show that Sheide's decision was based on his medical judgment, I will grant summary judgment for defendants on Stechauner's claim against Sheide.

While Stechauner was in restricted housing, he asked Sheide to refer him to a psychiatrist because he felt depressed and suicidal every day, could not sleep, and suffered from anxiety attacks. As a general rule, Sheide believes that psychologists should try to work with patients to develop coping skills before resorting to psychoactive drugs. And although Sheide knew that Stechauner had a previous diagnosis for major depressive disorder, Stechauner had not received psychiatric treatment for that disorder in more than three years. Dkt. 96, ¶¶ 59–60. Based on Stechauner's symptoms, Sheide believed that his major depressive disorder was either in remission or a misdiagnosis. He refused to write a psychiatric referral, and instead provided counseling, discussed coping techniques, and gave Stechauner reading materials and worksheets to keep his mind busy. Stechauner then filed a grievance asking the prison to order Sheide to write a referral. Dkt. 73-7, at 1–7. But before the grievance was reviewed, Stechauner was released from restricted housing and Sheide stopped treating him.

Stechauner continued to file psychological-service requests, and a different psychologist upgraded the severity of Stechauner's "mental health classification."[4] Dkt. 96, ¶ 62. Around

---

[4] Neither side explains how the prison's mental health classification system works.

the same time that his classification was changed, the grievance examiner reviewed Stechauner's grievance and recommended a reassessment of Stechauner's major depressive disorder to determine whether it warranted a psychiatric referral. Dkt. 73-7, at 1. Based on these two events, staff in the psychological services unit at OCI decided to refer Stechauner to a psychiatrist.[5] The psychiatrist prescribed Stechauner medication for insomnia but did not prescribe any medication for depression or anxiety.

Stechauner contends that these facts demonstrate that Sheide was deliberately indifferent. But all they show is that another psychologist reassessed Stechauner's file and disagreed with Sheide's assessment. And for a claim of deliberate indifference, the question is not whether another professional disagreed with Sheide's original decision. *See Greeno*, 414 F.3d at 653. The question is whether Sheide's original decision was based on medical judgment. And in this case, Sheide's original decision reflects his normal practice of recommending psychotropic medication only as a last resort after other forms of counseling. Stechauner may disagree with this approach, but he has not pointed to any evidence that it is so far outside the scope of accepted professional standards that it constitutes deliberate indifference. *See Petties*, 836 F.3d at 729.

Furthermore, defendants have presented evidence that Sheide's original decision was based on more than just a general distaste for psychiatric drugs. Although Sheide did not make the decision to refer Stechauner to a psychiatrist, he was the person who filled out the paperwork for the referral.[6] And in the referral form, Sheide gave three reasons why psychiatric

---

[5] It's not clear who made the decision to write the referral. Stechauner contends that the psychologist who changed his mental health classification also ordered the referral, but there is no evidence to support this contention.

[6] Stechauner disputes whether Sheide was the person who completed the referral form, in part

medication may not be necessary: (1) although Stechauner was diagnosed with major depressive disorder, his disorder appeared to either be in remission or a misdiagnosis; (2) on several occasions, Stechauner's self-reports of suicidal ideation appeared to be a manipulation tactic rather than a genuine mental health concern; and (3) Stechauner's behaviors are better explained by a personality disorder than by major depressive disorder. Dkt. 84-2. Again, Stechauner may disagree with this assessment, but there is no evidence to suggest that it was blatantly inappropriate.

### c. Claim against Hansen

Defendant Dorrie Hansen is a nurse at OCI. In October 2016, she worked the overnight shift, during which she reviewed health-service requests from prisoners. On October 24, Stechauner submitted a request asking to see a doctor because he was "still having serious chest pains." Dkt. 96, ¶ 69. Stechauner contends that Hansen violated the Eighth Amendment because she did not respond to the request or refer his request to other personnel.

It's undisputed that Hansen reviewed the request, and that she gave a copy to her assistant and put a copy in Stechauner's medical records. Under normal practices, Hansen should have also placed Stechauner on the "sick-call list" so that a nurse would visit him during the morning shift on October 25. But Hansen says that she cannot remember whether she placed Stechauner on the sick-call list or not, and it's undisputed that no one saw Stechauner in response to his request. So Stechauner filed a follow-up request the next night. Hansen

---

because the form is unsigned and undated. Dkt. 96, ¶¶ 65–66. Stechauner is correct that the signature line of the form is blank, but the form still lists Sheide as the referring psychologist. Dkt. 84-2. Stechauner cites no evidence that someone else completed the form.

reviewed it and placed Stechauner on the sick-call list, and a nurse examined him on October 26.

Defendants concede that they do not know why Stechauner wasn't seen on October 25. A reasonable jury could conclude that Hansen did not place him on the sick-call list. But it's also undisputed that Hansen forwarded Stechauner's request to at least one other staff member and placed it in his medical file, which suggests that Hansen did not intend for the request to be ignored. And the next day, she screened Stechauner's follow-up request and ensured that he received treatment. Based on these facts, the only reasonable inference that can be drawn in Stechauner's favor is that Hansen was negligent. And negligence does not violate the Eighth Amendment.

Stechauner contends that Hansen is nonetheless liable because she should have seen him immediately upon reviewing his request. He argues that if she had seen him herself during the night shift, then there would have been no delay. He points to the grievance that he filed about his lack of care, and the complaint examiner's conclusion that reports of chest pain should be evaluated quicker than the following day. *See* Dkt. 73-7, at 33.

Stechauner is correct that, as a general matter, complaints of chest pain should usually be evaluated promptly. After all, chest pains may be evidence of a heart attack, difficulty breathing, or other emergency situations. But here, Stechauner was complaining about *chronic* chest pains. That month alone, Stechauner had already filed at least five other health-service requests that complained about chest pains, Dkt. 82-2, at 319–23, including two that were reviewed by Hansen, *id.* at 319, 322. In each request, Stechauner characterized his chest pains as ongoing, rather than an emergency. When Stechauner filed a sixth request that also complained about ongoing chest pains, Hansen reasonably assumed that it was not an

17

emergency. Because no jury could conclude that this was deliberate indifference, I will grant summary judgment for defendants on Stechauner's claim against Hansen.

### d. Claims against Wheatley

Defendant Phillip Wheatley became Stechauner's primary care provider on November 10, 2016. I allowed Stechauner to proceed on two claims against Wheatley: (1) Wheatley ignored his requests for medical care in November 2016 and did not treat him until January 2017; and (2) Wheatley failed to treat Stechauner's paralyzed vocal cord after it was diagnosed in 2017.[7] I will address each claim in turn.

**Claim 1: Failure to provide treatment in November and December 2016.** Stechauner contends that Wheatley failed to treat him in November and December 2016, but the undisputed facts show that Stechauner actually received continuous treatment throughout that time period. On November 10, Wheatley examined Stechauner, ordered a CT Scan and barium-swallow test to diagnose Stechauner's chest and digestive issues, and prescribed tramadol (a narcotic) to treat Stechauner's pain. Dkt. 82-1, at 208–09. Wheatley examined Stechauner two more times on December 8 and December 30. Between these appointments, Wheatley monitored Stechauner's chart and issued treatment orders. For example, it's undisputed that, separate from the face-to-face-appointments, Wheatley also adjusted Stechauner's medication three times, issued preparation orders for diagnostic tests, sent

---

[7] Both parties also argue in their briefs whether Wheatley acted reasonably when he discontinued Stechauner's prescription for benzonatate in March 16, 2017. But this claim is outside the scope of Stechauner's amended complaint, Dkt. 22, and outside the scope of the claims I allowed Stechauner to proceed on at screening. However, I note that even if I were to consider this claim, it is undisputed that Wheatley continued to provide other medications, Dkt. 96, ¶ 83, and that Wheatley ordered extensive testing to diagnose Stechauner's cough, even after he ended the prescription for benzonatate. *Id.*, ¶ 85.

Stechauner the results of diagnostic tests, ordered an appointment with an an ear, nose, and throat specialist, and issued a psychiatric referral (separate from the psychiatric referral written by Sheide).

Stechauner nonetheless contends that Wheatley should have met with him when he filed health-service requests on November 14, November 20, December 19, and December 28. But all of these requests were reviewed and referred to nursing staff, rather than Wheatley. Dkt. 73-15, at 3–4 and Dkt. 73-16. And each one complained about the same chronic health issues for which Stechauner was already receiving treatment. Stechauner does not explain why he needed to see Wheatley face-to-face when Wheatley was already monitoring his chart, tracking changes in his condition, and issuing treatment orders.

In the end, Stechauner's claim boils down to an argument that Wheatley must have denied him treatment because his cough did not get better. But as I explained in my order denying Stechauner's motion for preliminary injunction: the fact that treatment is unsuccessful does not mean that the treatment violates the constitution. The Eighth Amendment prohibits prison officials from turning a blind eye to serious medical problems, but it does not promise a cure for every ailment.

**Claim 2: Failure to treat paralyzed vocal cord.** On February 14, 2017, an ear, nose, and throat specialist diagnosed Stechauner with a paralyzed vocal cord. The specialist recommended a CT scan and an endoscopy to determine the cause of the paralysis, but he did not prescribe any treatment to cure the paralysis or treat its symptoms. Dkt. 73-17. Wheatley ordered the tests, and Stechauner received a CT Scan on March 13, Dkt. 96, ¶ 87, and an endoscopy on March 29, Dkt. 82-1, at 260–61. At a follow-up appointment on May 18, the specialist determined that the paralysis had resolved itself.

Stechauner contends that although Wheatley ordered diagnostic tests, he did not "treat" the vocal cord paralysis. But Wheatley did everything that the specialist recommended——no jury could conclude that he ignored the diagnosis. There is no evidence that additional treatment was available, and indeed, Wheatley contends that there is no treatment for a paralyzed vocal cord. Like his first claim against Wheatley, this claim simply stems from Stechauner's frustration that Wheatley was unable to quickly cure his condition. This is unfortunate, but it does not mean that Wheatley violated the Eighth Amendment. I will grant summary judgment for defendants on Stechauner's claims against Wheatley.

### 4. Conclusion

Stechauner's claim against Neau will need to go to trial. But I will grant summary judgment for defendants on all of Stechauner's claims against medical staff. Defendants Murphy, Sheide, Hansen, and Wheatley will be dismissed from the case.

## B. Motion for assistance in recruiting counsel

Stechauner has filed a renewed motion for assistance in recruiting counsel. Dkt. 99. I will deny the motion.

Under 28 U.S.C. § 1915(e)(1), I can assist in recruiting counsel for pro se plaintiffs. *See Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007) (en banc). But almost all of this court's pro se litigants would benefit from the assistance of counsel, and there are not enough lawyers willing to take these types of cases to give each plaintiff one. I must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

To prove that assistance in recruiting counsel is necessary, this court generally requires that pro se plaintiffs: (1) provide the names and addresses of at least three lawyers who decline to represent them in the case; and (2) demonstrate that theirs is one of those relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds their demonstrated ability to prosecute it. *Pruitt.* 503 F.3d at 655; *see also Young v. Cramer*, No. 13-cv-77, 2013 WL 5504480, at *2 (W.D. Wis. Oct. 3, 2013). Stechauner satisfies the first requirement because he has submitted letters from several lawyers who declined to represent him. Dkt. 59-1. But Stechauner fails the second requirement because he has not shown that this case will be too complex for him to handle.

He says that he cannot litigate the case because he has a limited education, he has thus far relied on a jailhouse lawyer, and the case involves complex medical issues. But a lack of legal knowledge is unfortunately common among pro se prisoner litigants. It is not in itself a reason to recruit counsel. And I have already granted summary judgment on the medical treatment claims, so the case no longer involves complex disputes over medical care.

The only claim remaining in this case is Stechauner's claim against Neau. The dispute at the center of this claim is whether Stechauner told Neau he was suicidal and Neau ignored him. Stechauner does not need to make complicated legal arguments to prove his case against Neau. He simply needs to tell his side of the story. He can do this by testifying about what happened and calling any witnesses who observed what happened.

So I will deny Stechauner's motion for assistance in recruiting counsel. Soon, I will send Stechauner a trial preparation order that will explain how to prepare for trial, and what steps he should take next.

ORDER

IT IS ORDERED that:

1. Plaintiff Matthew Stechauner's motion for summary judgment, Dkt. 69, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 79, is GRANTED in part:

   a. Summary judgment is GRANTED for defendants on Stechauner's claims against Patrick Murphy, Troy Sheide, Dorrie Hansen, and Phillip Wheatley.

   b. Summary judgment is DENIED on Stechauner's claim against Gary Neau.

3. Defendants Murphy, Sheide, Hansen, and Wheatley are DISMISSED from the case.

4. Plaintiff's motion for assistance in recruiting counsel, Dkt. 99, is DENIED.

Entered March 25, 2019.

BY THE COURT:

/s/
_____

JAMES D. PETERSON
District Judge